Richard KUBICKO, Plaintiff–Appellant,

v.

OGDEN LOGISTICS SERVICES, a joint venture between Ogden Allied Services and System Planning Corporation; Ogden Allied Building Airport Services, Incorporated, t/a Ogden Allied Services Corporation; System Planning Corporation; Edward G. Stuckrath; David Franck, Defendants–Appellees,

Prince George's County, Maryland, Movant.

No. 97–2527.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 26, 1999.

Decided June 7, 1999.

Before WIDENER, MURNAGHAN, and HAMILTON, Circuit Judges.

Vacated and remanded by published opinion. Judge HAMILTON wrote the opinion, in which Judge MURNAGHAN joined. Judge WIDENER wrote a separate concurring and dissenting opinion.

## OPINION

HAMILTON, Circuit Judge:

Richard Kubicko (Kubicko) appeals the district court's grant of summary judgment in favor of Ogden Logistics Services, Ogden Allied Building Airport Services, Inc., t/a Ogden Allied Services, and System Planning Corporation (the Defendants) on his claim alleging retaliation for his opposition to sexual harassment visited on one of his subordinates by his immediate supervisor and for his participation in a related protected proceeding in violation of § 704 of Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e–3(a). We hold that Kubicko proffered sufficient evidence of retaliatory animus to trigger application of the mixed-motive proof scheme first annunciated in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality), and that genuine issues of material fact exist making summary judgment in favor of the Defendants inappropriate. *See* Fed. R.Civ.P. 56. Accordingly, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

### I.

From early April 1989 until early January 1995, Ogden Logistics Services (OLS) employed Kubicko as a logistics engineer in its integrated logistics support branch (ILS Branch).[1] OLS is an unincorporated

**ARGUED:** Jack L. Gould, Fairfax, Virginia, for Appellant. Karen Ann Khan, Jackson, Lewis, Schnitzler & Krupman, Washington, DC; Kevin Michael Hodges, Williams & Connolly, Washington, DC, for Appellees. **ON BRIEF:** Maria L. Acebal, Williams & Connolly, Washington, DC, for Appellees.

---

1. Because we are reviewing the propriety of the district court's grant of summary judgment in favor of the Defendants, we present the facts in the light most favorable to Kubicko, drawing all reasonable inferences from the affidavits, depositions, and attached ex-

joint venture of two defense contractors—Ogden Allied Building Airport Services, Inc., t/a Ogden Allied Services, and System Planning Corporation. At all times relevant to this appeal, OLS had a contract with the National Aeronautics Space Administration (NASA) to provide logistical support services for the Hubble Space Telescope Project at Goddard Space Flight Center, which is located in Greenbelt, Maryland.[2] The contract terminated on April 16, 1995.

From the time Kubicko began working at OLS until the beginning of 1993, he received almost no criticism of his work and consistently received positive performance evaluations. The most recent performance evaluation contained in the record is for the period of April 1, 1991 through March 31, 1992, which rates Kubicko's overall performance as "exceptional," the highest rating possible. (J.A. 80). The record also contains several letters written to Kubicko in 1992 by higher-ups at OLS commending him on his cooperation and team effort in the completion of certain projects. Additionally, the record contains certificates of achievement awarded to Kubicko by NASA, dated as late as September 16, 1994. The record also shows that some of Kubicko's coworkers at OLS and some of his contacts and counterparts at NASA viewed with approval his job performance and his overall professionalism. As the district court summarized in its memorandum opinion accompanying its order granting the Defendants' motions for summary judgment:

> For example, James Barcus, the [NASA] Program Manager for the Hubble Space Telescope project, testified that Kubicko's "services were always excellent for the work he did for me."

Similarly, Robert Herrick, a co-employee [of Kubicko], testified that Kubicko handled the "communication aspects" of his job in a "superb" fashion. Linda Bingham, a supply systems analyst at NASA, testified that Kubicko "always got things in on time" and "never got a bad rating on a PEB, the Performance Evaluation Board write-ups."

(J.A. 21).

In early January 1993, OLS failed to select Kubicko for the position of ILS Branch Head, choosing instead a man named Troy Shirley (Shirley). Believing he possessed superior qualifications and experience as compared to Shirley, Kubicko wrote a memorandum to OLS's then program manager, Al Walke (Walke), complaining about his non-selection. After outlining his own qualifications and experience and comparing them to those of Shirley, Kubicko stated: "I find your decision insulting, demeaning, belittling, and embarrassing to me." (J.A. 949). Kubicko closed the memorandum by stating:

> I will continue as always, to loyally support OLS but I protest your actions. This letter documents my displeasure with your designation of the Branch Chief of ILS. I feel your selection was, among other things, biased, unfair, unjustified, disloyal, prejudicial, and discriminatory.
>
> I am grieved by your decision, formally take exception to it, and respectfully request that you reconsider.

(J.A. 949).

OLS did not reconsider its decision to hire Shirley as ILS Branch Head, and therefore, in a self-performance evaluation dated March 15, 1993, Kubicko wrote

hibits submitted below in his favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam) ("On summary judgment the inferences to be drawn from the underlying facts contained in [the affidavits, attached exhibits, and depositions submitted below] must be viewed in the light most favorable to the party opposing the motion."); *Smith v. Virginia Common-*

*wealth Univ.,* 84 F.3d 672, 675 (4th Cir.1996) (*en banc* ).

2. Ogden Allied Services provided OLS with the bulk of its financial, human, and managerial resources, while System Planning Corporation contributed expertise in logistics and bid development.

that his goal was to finish what he started and to make the contract a success, thus making himself and OLS synonymous with superb logistics support. To this end, Kubicko stated that he has been an understanding, dedicated, loyal, successful, and productive employee, for which he expected support, reward, and recognition from management. Kubicko then complained that instead he was "deceived, demeaned, disappointed, dejected, disrespected, degraded, discriminated against, maligned, insulted, slandered and suspected." (J.A. 952–53). Kubicko closed with the following statement: "Gee, I wonder what it would be like if I was a 'screw-off.'"(J.A. 953). OLS failed to select Kubicko for the position of ILS Branch Head again in June 1993 when it replaced Shirley with a man named David Franck (Franck).[3]

Kubicko had grown so dissatisfied with OLS by the fall of 1993 that he allowed one of OLS's competitors, Cortez III Service Corporation (Cortez III), to use his name in a contract bid to provide logistics services to the Goddard Space Flight Center. Additionally, Kubicko signed a letter of commitment stating that he would accept the position of Project Logistics Branch Head if Cortez III was awarded a contract. Apparently, Cortez III was not awarded the sought after contract, because Kubicko never left OLS in order to work for Cortez III.

Many of the events at issue in the present suit occurred in the fall and winter of 1994 and in the first week of January 1995. First, at some point in September 1994, the exact day is not specified in the record, Kubicko sent an e-mail to Franck, Lindy Bingham (Bingham), Goddard Space Flight Center's manager for the inactive equipment storage program, and Tom White, NASA's chief of the logistics management division at Goddard Space Flight Center, in which Kubicko openly criticized in sarcastic language a certain proposal by Franck to NASA management. The proposal suggested that two particular OLS employees, John Galloway and Gary King, temporarily perform data entry functions with respect to a portion of a project referred to as "SIMS." Kubicko closed the e-mail with a direct criticism of his immediate supervisor:

> This cc mail is dangerous. If people would just talk before they put things in writing, all this typing would be unnecessary. I'm a lousy typist and don't do data entry either! My fingers hurt!

(J.A. 72). Shortly before Kubicko sent this e-mail, Bingham had requested that Kubicko relay to Franck that she did not think John Galloway and Gary King should perform data entry for the SIMS project. She made this request of Kubicko, because she felt Kubicko could relay how she felt without anger to Franck. Kubicko sent the e-mail in response to her request. Subsequently, Bingham testified that Kubicko's e-mail in response to her request did not upset her.

On or about the second or third week of September 1994, Leslyn Joyner (Joyner), an OLS data entry clerk and subordinate of Kubicko, complained to Kubicko that Franck had sexually harassed her on numerous occasions. Kubicko promptly discussed Joyner's complaint with Kyle Worrell (Worrell), OLS's human resources manager. Kubicko informed Worrell that Franck's actions constituted sexual harassment of Joyner, he had witnessed some of the actions, and Franck must be stopped.

---

**3.** In its memorandum opinion accompanying its order granting the Defendants' motions for summary judgment, the district court asserts that Franck was the newly selected ILS Branch Head referred to in Kubicko's January 6, 1993 memorandum to Walke. The Defendants expressly reiterate this assertion in their brief. The record establishes that both the district court and the Defendants are wrong on this point. The subject of Kubicko's memorandum could not possibly have been Franck, because the record is undisputed that Franck did not even submit an application for employment with OLS until May 6, 1993. Additionally, Walke testified in his deposition without contradiction that Franck was not made ILS Branch Head until approximately June 1993.

Kubicko then informed Joyner that he would support her if she desired to pursue the matter further.

Approximately two days after Joyner first informed Kubicko of her allegations of sexual harassment against Franck, she took those allegations to Worrell, who began an internal investigation.[4] At the conclusion of his approximately two week investigation, Worrell concluded that Joyner's allegations were true and recommended to Walke and Franck's immediate supervisor Edward Stuckrath (Stuckrath) that Franck be terminated.[5] The record is undisputed that Worrell, Walke, and Stuckrath were aware of similar complaints in the past about Franck made by other female employees at OLS.

After Stuckrath learned of Worrell's internal investigation, Stuckrath ordered it stopped and began his own internal investigation. At the conclusion of this second internal investigation, Stuckrath agreed that some evidence supported Joyner's allegations, but believed that Franck deserved a reprimand and counseling as opposed to termination.

At around this same time, on October 3, 1994, Franck physically handed Stuckrath a memorandum addressed to Kubicko. The memorandum outlined numerous alleged actions and inactions on the part of Kubicko that Franck believed amounted to insubordination. Franck told Stuckrath, who had the authority as program manager to terminate Kubicko, that in light of the information in the memorandum, he believed Kubicko should be terminated immediately. After reading the memorandum, Stuckrath told Franck that he had the blessing of Walke on the executive committee to terminate Kubicko but that he did not feel it was time to do that, because he did not feel like he had enough background to be able to justify terminating Kubicko at that time.

In late November 1994, Joyner filed formal complaints of sexual harassment with the Prince George's County Human Relations Commission (the HRC) and the Equal Employment Opportunity Commission (the EEOC). She specifically alleged that Franck had sexually harassed her from August 1994 to October 4, 1994. She also gave Kubicko's name as a person who could corroborate her allegations. As a result, the HRC interviewed Kubicko in early December 1994 as part of its administrative investigation of Joyner's complaint. During the interview, Kubicko stated that he witnessed Franck sexually harass Joyner.

Shortly thereafter, the same HRC investigator met with Walke for a mediation conference regarding Joyner's sexual harassment complaint. At the conference, the HRC investigator informed Walke that Kubicko had participated as a witness in her investigation. In response, Walke stated that Joyner and Kubicko had conspired to file the complaint.

Approximately two days prior to Kubicko's termination on January 6, 1995, Worrell, Walke, and Stuckrath met in Worrell's office to discuss Joyner's allegations against Franck. By this time, Stuckrath knew that Kubicko had complained to Worrell about Franck sexually harassing Joyner and that the HRC investigator had interviewed Kubicko regarding Joyner's sexual harassment allegations. Worrell's assistant Bruce Barr (Barr) overheard Stuckrath state at the meeting that he felt OLS's internal investigation into Joyner's allegations should be terminated and

> there was no need for Dave Franck to be terminated, and that if anyone needed to be terminated it should be Mr. Kubicko because he felt that this was all bogus and that obviously Mr. Kubicko, perhaps must be having some hormonal

4. Worrell worked under the supervision of Thomas Mann, OLS's administrative branch head.

5. At some point in time prior to October 3, 1994, Stuckrath apparently succeeded Walke as program manager and Walke became a member of OLS's executive committee.

imbalance of either an over abundance or lack thereof of testosterone and this whole thing [*i.e.*, both Mr. Kubicko and the investigation] should just be terminated.

(J.A. 144) (Deposition Testimony of Barr). Stuckrath further reiterated that Kubicko "just fabricated all this up." (J.A. 144B) (same). At the end of the meeting, Worrell stuck his head out of his office and asked Barr to pull Kubicko's personnel file because Stuckrath wanted it.

Shortly thereafter, Stuckrath made the final decision to terminate Kubicko and the three members of OLS's executive committee concurred in Stuckrath's decision without discussion or comment. On January 6, 1995, Stuckrath informed Kubicko that he was terminated. In the course of discussing why Kubicko was being terminated, Stuckrath told Kubicko that he (Kubicko) initiated Joyner's complaint of sexual harassment against Franck and "that it would have made a 'hell of a difference' to him had [Kubicko] gone to him instead of Human Resources about Ms. Joyner's complaint." (J.A. 448) (Affidavit of Kubicko).

When Mann, OLS's administrative branch head, learned that Stuckrath had terminated Kubicko, he was shocked because OLS's contract with NASA was nearing completion, Kubicko's position was critical to the contract, and replacing Kubicko would be difficult. As for Joyner, OLS settled with her regarding her sexual harassment allegations at some point, but the record is unclear as to when.

After receiving a right to sue letter from the EEOC, Kubicko filed this action in the United States District Court for the District of Maryland on March 13, 1997. Kubicko's complaint alleged a Title VII retaliation claim against the Defendants and two Maryland state law claims against Franck and Stuckrath that are not at issue in this appeal.

At the close of discovery, all parties moved for summary judgment on all counts. In their motions, the Defendants asserted Kubicko was terminated for poor performance (*e.g.*, late submission of documents) and insubordination (*e.g.*, refusal to prepare an inventory plan as directed by Stuckrath and sending the e-mail to NASA personnel in which Kubicko criticized one of Franck's proposals). Kubicko challenged the Defendants' motions on alternative grounds. He first contended that he was entitled to the plaintiff-friendly mixed-motive proof scheme first annunciated in *Price Waterhouse*, 490 U.S. at 228, 109 S.Ct. 1775, which is triggered by the presentation of " 'direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion.' " *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) (quoting *id.* at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)). Alternatively, Kubicko contended that he proffered sufficient circumstantial evidence under the *McDonnell Douglas* proof scheme to survive the Defendants' summary judgment motions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The district court concluded that Kubicko did not proffer evidence sufficient to trigger application of the mixed-motive proof scheme. Further, the district court concluded that Kubicko failed to proffer sufficient evidence under the *McDonnell Douglas* proof scheme to survive the Defendants' motions for summary judgment. Accordingly, the district court granted the Defendants' motions for summary judgment on Kubicko's Title VII retaliation claim and dismissed the state law claims against Franck and Stuckrath without prejudice. Kubicko filed a timely notice of appeal.

## II.

On appeal, Kubicko challenges the district court's grant of the Defendants' motions for summary judgment on two alternative grounds. He first contends the district court's failure to conclude that his retaliation claim deserved application of

the mixed-motive proof scheme resulted in the district court erroneously granting the Defendants' motions for summary judgment. Alternatively, he contends that the district court's conclusion that he failed to proffer sufficient circumstantial evidence under the *McDonnell Douglas* proof scheme to survive the Defendants' motions for summary judgment was erroneous.

■ We review the district court's grant of the Defendants' motions for summary judgment *de novo*. *See Smith*, 84 F.3d at 675. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing the propriety of a district court's grant of summary judgment, we view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences from the affidavits, depositions, and attached exhibits submitted below in his or her favor. *See Diebold, Inc.*, 369 U.S. at 655, 82 S.Ct. 993; *Smith*, 84 F.3d at 675.

We begin our consideration of the issues presented in this appeal by examining § 704(a) of Title VII, which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). Under this language, protected activities fall into either the opposition clause or the participation clause.

■ "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir.1998). Whether an employee has engaged in protected opposition activity, turns upon balancing "the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* (internal quotation marks omitted) (ellipses in original). We have previously held that under this balancing test, as long as an employee complains to his or her employer or participates in an employer's informal grievance procedure in an orderly and nondisruptive manner, the employee's activities are entitled to protection under § 704's opposition clause. *See id.* at 260; *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir. 1996); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981). Participation activity encompasses, as outlined in the statute, making a charge, testifying, or participating in any manner in a Title VII investigation, proceeding, or hearing.

■ Here, Kubicko alleges that he was terminated in retaliation for: (1) opposing Franck's unlawful sexual harassment of Joyner by reporting Franck's actions to Worrell, OLS's human resources manager, and informing Worrell that he opposed such actions; and (2) for participating in the investigation of Joyner's sexual harassment complaint conducted by the HRC. The Defendants do not contest that Kubicko's reporting Franck's acts of sexual harassment toward Joyner to Worrell accompanied by his statements to Worrell opposing Franck's actions fall within § 704's opposition clause. Indeed, there is no evidence to suggest that Kubicko met with Worrell in any other manner than an

orderly and nondisruptive manner. Under our precedent, his measured actions are entitled to protection under § 704's opposition clause. *See Laughlin,* 149 F.3d at 260. The Defendants also do not contest that Kubicko's participation in the investigation of Joyner's sexual harassment complaint by the HRC falls within § 704's participation clause as participation in an investigation under Title VII.[6] Accordingly, we proceed to consider Kubicko's contention that he is entitled to application of the mixed-motive proof scheme.

■ In *Price Waterhouse,* a plurality of the Supreme Court first annunciated the mixed-motive proof scheme. *See Price Waterhouse,* 490 U.S. at 228, 109 S.Ct. 1775. Stated simply, under this proof scheme, once a plaintiff in a Title VII case shows that a factor made illegal under Title VII played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not allowed the illegal factor to play such a role.[7] *See id.* at 244–45, 109 S.Ct. 1775.

■ We have subsequently explained that a Title VII plaintiff qualifies for application of the mixed-motive proof scheme if the plaintiff presents " 'direct evidence that decision makers placed substantial negative reliance on an illegitimate criterion.' "[8] *Fuller,* 67 F.3d at 1142 (quoting

---

**6.** We note that the EEOC has determined that the HRC qualifies as a deferral agency under Title VII. *See* 29 C.F.R. § 1601.74. To qualify as a deferral agency, the agency must be "a State or local agency with authority to grant or seek relief from [an unlawful employment] practice or to institute criminal proceedings with respect thereto upon receiving notice thereof...." 42 U.S.C. § 2000e–5(e)(1).

**7.** In 1991, Congress enacted § 107(a) of the Civil Rights Act of 1991, which provides that "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). Thus, with respect to employment decisions based upon an employee's race, color, religion, sex or national origin, § 107(a) of the Civil Rights Act of 1991 overruled the portion of *Price Waterhouse* allowing employers a full affirmative defense in mixed-motive cases. Now, proof by the employer that it would have reached the same determination in the absence of discriminatory animus with respect to the enumerated illegal reasons only limits the remedies available to the plaintiff. *See Fuller,* 67 F.3d at 1142.

Noticeably absent from § 107(a) of the Civil Rights Act of 1991 is a reference to retaliation claims. It is true that retaliation is deemed an "unlawful employment practice" in 42 U.S.C. § 2000e–3(a), which is the same label given to discrimination on one of the five grounds listed in § 107(a) of the Civil Rights Act of 1991. However, unlike the treatment of those five categories, § 107(a) of Civil Rights Act of 1991 does not expressly roll back *Price Waterhouse*'s application to retaliation claims. The only three of our sister circuits to have addressed the application of § 107(a) of the Civil Rights Act of 1991 to retaliation claims have unanimously held that it does not apply to retaliation claims. *See McNutt v. Board of Trustees of the Univ. of Ill.,* 141 F.3d 706, 708–09 (7th Cir.1998); *Woodson v. Scott Paper Co.,* 109 F.3d 913, 932–36 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997); *Tanca v. Nordberg,* 98 F.3d 680, 682–85 (1st Cir.1996), *cert. denied,* 520 U.S. 1119, 117 S.Ct. 1253, 137 L.Ed.2d 333 (1997). Each relied on the absence of the term "retaliation" in 42 U.S.C. § 2000e–2(m) for its holding. We find their logic persuasive, and therefore, join them in holding that § 107(a) of the Civil Rights Act of 1991 does not apply to retaliation claims.

**8.** Without the least bit of rationale or federal circuit court authority, the Defendants boldly argue that the mixed-motive proof scheme is never available to a Title VII plaintiff in order to prove a retaliation claim under § 704. While the Fourth Circuit has never had an occasion to explicitly hold that the mixed-motive proof scheme is available to a Title VII plaintiff in order to prove a retaliation claim under § 704 if the plaintiff can establish the evidentiary threshold, our sister circuits have unanimously applied the mixed-motive proof scheme to retaliation claims. *See Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 549–551 (10th Cir.1999); *Thomas v. Nat'l Football League Players Ass'n,* 131 F.3d 198, 202–203 (D.C.Cir.1997); *Tanca,* 98 F.3d at 685; *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039–41 (2d Cir.1993); *Griffiths v. CIGNA*

*Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)). We have further explained that such a showing requires "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* The determination of whether a plaintiff has satisfied this evidentiary threshold is a decision for the district court after it has reviewed the evidence, *see id.* at 1142, which "ultimately hinges on the strength of the evidence establishing discrimination," *id.* at 1143. Absent the threshold showing necessary to invoke the mixed-motive proof scheme, however, a plaintiff must prevail under the less advantageous standard of liability applicable in pretext cases in which the plaintiff always shoulders the burden of persuasion. *See id.* at 1143.

■ Thus, the broad issue before this court is whether the district court erred by concluding that Kubicko failed to make the threshold evidentiary showing necessary to trigger application of the mixed-motive proof scheme. At a more focused level, the issue before this court is whether the following statements and conduct constitute evidence "that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision," *Fuller,* 67 F.3d at 1142: (1) Stuckrath's statements, made at a meeting between OLS's human resource manager and administrative branch head approximately two days prior to Stuckrath's termination of Kubicko, to the effect that OLS's internal investigation of Joyner's sexual harassment allegations should be terminated, and that if anyone should be terminated over Joyner's sexual harassment allegations it should be Kubicko, because he believed that "this was all bogus," and Kubicko "just fabricated all this up," (J.A. 144B); (2) Mann's request at the end

of the meeting for Kubicko's file, "because Ed Stuckrath wanted it," (J.A. 144); (3) Stuckrath's statement to Kubicko in the course of discussing why Kubicko was being terminated, that he (Kubicko) initiated Joyner's complaint of sexual harassment against Franck; and (4) Stuckrath's statement at the same time "that it would have made a 'hell of a difference' to him had [Kubicko] gone to him instead of Human Resources about Joyner's complaint," (J.A. 448)(Affidavit of Kubicko).

We conclude this evidence considered *in toto* both reflects directly the alleged retaliatory attitude against Kubicko and bears directly on OLS's decision to terminate Kubicko. Numerous factors support our conclusion. First, Stuckrath made the final decision to terminate Kubicko. Second, Stuckrath made some of the statements at issue only approximately two days prior to Kubicko's termination and the remainder at the time he informed Kubicko that he was terminated. Three, Stuckrath requested Kubicko's personnel file at the end of the meeting where he said that Kubicko should be terminated because of all of his involvement in Joyner's sexual harassment allegations against Franck. And four, Stuckrath's comments on their face reflect a direct connection between Kubicko's protected activity under § 704 and his termination. In short, Kubicko presented sufficient evidence, when viewed in the light most favorable to Kubicko, that both reflects directly Stuckrath's alleged retaliatory attitude and that bears directly on Kubicko's termination to permit a reasonable jury to find that Stuckrath placed substantial negative reliance in terminating Kubicko on the fact that Kubicko opposed Franck's sexual harassment of Joyner and participated in the HRC's investigation of Joyner's sexual

*Corp.,* 988 F.2d 457, 468 (3d Cir.1993), *overruled on other grounds, Miller v. CIGNA Corp.,* 47 F.3d 586, 596 n. 8 (3d Cir.1995). Because we are unable to fathom any plausible reason for holding otherwise, we expressly join our

sister circuits in holding that the mixed-motive proof scheme is available to a Title VII plaintiff in order to prove a retaliation claim under § 704 if the plaintiff can establish the necessary evidentiary threshold.

harassment complaint. *See Fuller*, 67 F.3d at 1142.

■ The fact that Stuckrath may have legitimately believed that Kubicko had fabricated the sexual harassment allegations against Franck is of no moment under § 704's participation clause. We recently held in *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411 (4th Cir.1999) that the application *vel non* of the participation clause does not turn on the substance of an employee's testimony regardless of how unreasonable that testimony may be. *See id.* at 413–14. The direct implication of our holding is that application *vel non* of the participation clause does not turn on the substance of an employee's answers during an interview as part of an EEOC or deferral agency investigation regardless of how unreasonable those answers may be or whether they even relate to the subject Title VII investigation or action.

In *Glover*, Lydia Glover (Glover) brought a retaliatory discharge claim against her former employer, the South Carolina Law Enforcement Division (SLED). Glover alleged that SLED terminated her in retaliation for testimony she gave as a non-party witness during a deposition in a Title VII gender discrimination suit filed in the United States District Court for the District of South Dakota.

> With minimal prompting from the government's deposing attorney, Glover freely offered not only facts directly related to [the plaintiff's] problems with the South Dakota marshals office, but also her impressions of the operations of the South Carolina marshals office. In particular, Glover perorated upon the perceived failings of her successor as the South Carolina U.S. Marshal, Israel Brooks. During the course of her testimony Glover accused Brooks of mismanagement, destruction of office documents, wasting funds, inappropriate behavior, dishonesty, and discrimination.

*Id.* at 411–12. SLED subsequently terminated Glover and admitted that it did so in part because of the irrelevant content of her deposition testimony. Characterizing this testimony as " 'unresponsive, uncompelled, and gratuitous,' " the district court held that it was not protected participation under § 704(a). *Id.* at 413.

We reversed and remanded for further proceedings on the basis that even if Glover's irrelevant testimony "was unreasonable," it was nonetheless protected activity under § 704(a). *Id.* at 413–14. In reaching this decision, we relied upon the plain meaning of the term "testify," which is " '[t]o bear witness' " or " 'to give evidence as a witness' " and the fact that the term "testify" in § 704 is followed by the phrase "in any manner," which we identified as "a clear signal that the provision is meant to sweep broadly." *Id.* at 413–14 (quoting Black's Law Dictionary 1476 (6th ed. 1990)). Application of § 704's participation clause, we concluded, does not turn on the substance of an employee's testimony. *See id.* The logical extension of this conclusion is that application of § 704's participation clause does not turn on the substance of an employee's answers to interview questions by a deferral agency investigator.

We have not yet had an occasion to consider whether an employer is liable under § 704's opposition clause for retaliation if the employer took an adverse employment action against an employee in actual belief that the employee fabricated without foundation the content of his opposition activity, and the present appeal does not provide us with such an occasion. This is because when the evidence is viewed in the light most favorable to Kubicko, the record supports a finding that Stuckrath did not legitimately believe that Kubicko fabricated without foundation the allegations of sexual harassment against Franck. Significantly, the record contains evidence that at the time Stuckrath concluded his internal investigation of Joyner's sexual harassment allegations, he: (1) agreed that

some evidence supported Joyner's allegations; (2) believed that Franck deserved a reprimand and counseling as a resulting punishment; and (3) Stuckrath was aware that other female employees of OLS had previously made similar complaints about Franck.

 The Defendants argue that assuming *arguendo* that Kubicko proffered sufficient evidence to trigger application of the mixed-motive proof scheme, "the record in this case fully supports a finding that the employer would have made the decision to terminate [Kubicko] regardless of any unlawful motivation." (Defendants' Br. at 35). This argument is without merit. While the record when viewed in the light most favorable to the Defendants may indeed support a finding that OLS would have made the same decision to terminate Kubicko regardless of any unlawful motivation, the Defendants have not met their burden to prevail on their motions for summary judgment of showing that, when the evidence in the record is viewed in the light most favorable to Kubicko, there is no genuine issue of material fact as to whether Kubicko would have been terminated regardless of any unlawful motivation. At a minimum, the record contains two items of evidence which put the Defendants' assertion that it would have made the same decision to terminate Kubicko regardless of any unlawful motivation in dispute. First, Stuckrath refused to terminate Kubicko in early October 1994 when Franck presented the same list of alleged performance deficiencies and instances of insubordination on the part of Kubicko that the Defendants now claim resulted in Kubicko's termination, and there is no evidence that Stuckrath investigated any of these allegations in order to

get the background he told Franck he needed to justify terminating Kubicko. Second, Mann, OLS's administrative branch head, testified that when he learned that Kubicko had been terminated, he was shocked because OLS's contract with NASA was nearing completion, Kubicko's position was critical to the contract, and replacing Kubicko would be difficult. At a minimum, when these two items of evidence are viewed in the light most favorable to Kubicko, and all reasonable inferences there from are drawn in his favor, we have no doubt that summary judgment in favor of the Defendants was inappropriate.[9]

### III.

In conclusion, we hold that Kubicko proffered sufficient evidence of retaliatory animus to entitle him to application of the mixed-motive proof scheme and that genuine issues of material fact exist making the grant of summary judgment in favor of the Defendants inappropriate. Accordingly, we vacate the judgment in favor of the Defendants and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

WIDENER, Circuit Judge, concurring and dissenting:

I concur in the majority's decision to remand this case for further proceedings. I respectfully dissent to express my disagreement with the majority's instruction that the district court proceed with this case under the mixed-motive proof scheme of *Price Waterhouse* and with the majority's application of *Glover v. South Car-*

---

**9.** Below, System Planning Corporation made an alternative argument in support of its motion for summary judgment that it did not qualify as Kubicko's employer for purposes of liability under Title VII. *See* 42 U.S.C. § 2000e(b) (Title VII's definition of employer). The district court declined to reach the issue given its rejection of Kubicko's retaliation claim on the merits. System Planning press-

es this alternative argument on appeal, but we think the issue is one best left to the district court to decide in the first instance on remand. *See Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

olina Law Enforcement Div., 170 F.3d 411 (4th Cir.1999), to the instant case.

The district court's error was not that it ultimately applied a pretext proof scheme to Kubicko's claim of retaliation. Rather, the court erred by concluding that a mixed-motive analysis is inapplicable to a claim of retaliation as a matter of law. As the majority discusses in Fn. 8, our sister circuits that have considered the applicability of Price Waterhouse to retaliation claims have held that a mixed-motive proof scheme is not unavailable to a Title VII plaintiff in order to prove a retaliation claim under 42 U.S.C. § 2000e–3. Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 549–551 (10th Cir.1999); Thomas v. Nat'l Football League Players Ass'n, 131 F.3d 198, 202–203 (D.C.Cir.1997); Tanca v. Nordberg, 98 F.3d 680, 685 (1st Cir.1996); Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 893 (7th Cir.1996). I do not dissent from the majority's following these precedents. Therefore, the district court erred by failing to consider a mixed-motive proof scheme before analyzing this case under the pretext proof scheme of McDonnell Douglas and the cases which followed. ·

The majority, however, incorrectly requires that upon remand the proper course is for the district court to apply a mixed-motive proof scheme to Kubicko's retaliation claim. Rather than specifying which proof scheme is appropriate, however, we should simply remand this case for consideration under the proper framework for Title VII litigation that we developed in Fuller v. Phipps, 67 F.3d 1137, 1142–43 (4th Cir.1995). Under Fuller, a mixed-motive instruction may be warranted when a plaintiff proffers "direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion." 67 F.3d at 1142 (quoting Price Waterhouse, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring)).* If the plaintiff cannot satisfy this threshold showing, then a plaintiff may prevail if he proves that the

employer's stated reason for the adverse employment decision is pretextual. See Price Waterhouse, 490 U.S. at 247 n. 12, 109 S.Ct. 1775; Fuller, 67 F.3d at 1143. Whether a plaintiff has satisfied the evidentiary burden required to trigger the Price Waterhouse mixed-motive analysis is a decision for the district court after it has reviewed the evidence. Fuller, 67 F.3d at 1142.

A plaintiff or a court need not categorize a case as either a "pretext" or "mixed-motive" case during the initial stages of litigation because evidentiary showings during discovery and at trial will affect the classification of the case. See Price Waterhouse, 490 U.S. at 247 n. 12, 109 S.Ct. 1775; Fuller, 67 F.3d at 1142 n. 2. The district court must eventually determine whether a case is "pretext" or "mixed-motive" after evaluating the evidence and then instruct the jury accordingly. See Fuller, 67 F.3d at 1142 n. 2. By directing the district court to consider the case as a mixed-motive case, the majority substitutes its judgment for the district court's at an inappropriate and premature time in the litigation, and without benefit or consideration of the district court's superior position as a fact finder and its first-hand evaluation of the weight of evidence and credibility of the witnesses. See F.R.C.P. 52; Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). This appeal from a grant of summary judgment is the wrong time for an appellate court to make evidentiary and credibility determinations that the district court should first make after applying the proper analysis. We should vacate and remand for further consideration without requiring the district court to apply a mixed-motive analysis before it has had the opportunity to evaluate thoroughly all of the evidence under the proper Title VII analytical framework as I have laid it out above.

I further disagree with the majority's application of Glover v. South Carolina

* Justice White's concurrence in Price Waterhouse has not been separately analyzed that

has come to my attention. As to that, I reserve an opinion.

*Law Enforcement Div.,* 170 F.3d 411 (4th Cir.1999), to the instant case.

*Glover* is a case in which Miss Glover testified by deposition in a Title VII proceeding in a district court in South Dakota. Apparently some of her testimony related to the subject for which she was called as a witness, but a significant part of it consisted of uncalled-for criticism of one of her previous employers, the United States Marshal's Service in South Carolina. On account of so testifying, she was fired by her then current employer, the South Carolina Law Enforcement Division, and she sued that employer for retaliation under 42 U.S.C. § 2000e–3. That statute protects one who "has made a charge, *testified,* assisted, or participated in any manner" in a Title VII "proceeding, or hearing." (Italics added). The district court held that the fact that she testified in the Title VII proceeding in South Dakota did not give her protection under § 2000e–3 because she had testified unreasonably in the South Dakota deposition. We reversed, stating that the fact that her testimony was unreasonable did not lead to the conclusion that she was not protected under the retaliation clause because she testified. We stated:

> In fact, to adopt a reasonableness restriction would lead the federal courts into a morass of collateral litigation in employment discrimination cases.

*Glover,* 170 F.3d at 415. The stated reason for the majority's application of *Glover* to this case is that "[t]he logical extension of this conclusion [referring to reasonableness] is that application of ... [§ 2000e–3's] participation clause does not turn on the substance of an employee's answers to interview questions by a deferral agency investigator." Maj. op. at 554–55.

This construction of *Glover* turns the principle of that case on its head. Miss Glover was granted protection *because she testified* in the South Dakota Title VII proceeding, *not because of how she testified* in the South Dakota Title VII proceeding. It is the witness who gets the protection, not the testimony. The statute in terms protects one who has "*testified.*" This protection of Title VII is entirely consistent with the absolute common law immunity of a witness which has been recently confirmed by the Supreme Court in *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). It came to the same conclusion as did we in *Burke v. Miller,* 580 F.2d 108 (4th Cir.1978), and cited *Burke* in its decision. 460 U.S. 325, 328, n. 4, 103 S.Ct. 1108, 75 L.Ed.2d 96.

In the case before us, there is no hint that Kubicko was fired for testifying, so the concept is entirely foreign to this proceeding. Indeed, its attempted application here is an illustration of the truth of the statement in *Glover* that determining whether or not protection should be granted should depend upon the reasonableness of the testimony rather than the fact of testifying "would lead the federal courts into a morass of collateral litigation in employment discrimination cases." *Glover,* 170 F.3d at 415. Just that has happened here, being led into the morass of collateral litigation, in no small part because of the majority's strained construction of *Glover.*

Accordingly, excepting the remand, I respectfully dissent.